Thank you. May it please the court, counsel? Ten minutes each side. I understand, Your Honor. I would like to reserve two minutes. What's your time? Valentino Noudoulko is a 42-year-old single woman Pentecostal evangelist whose asylum application is based on her past persecution and the past persecution of Pentecostals as a group in the Ukraine. The court has found that the government is unwilling or unable to control. This is an interesting case because the immigration judge applied an erroneous analysis of the difference between mere discrimination and persecution. And the country reports submitted by the government to the immigration judge indicate a finding by Congress of a historical pattern of persecution of evangelical Christians in the Ukraine recognized by Congress in the Lautenberg Amendment. And the question is, does the record reflect that Valentino Noudoulko escaped that pattern of persecution, or was she included in the group that was in that pattern of persecution in the Ukraine? Now, the Board of Immigration Appeals in this case simply adopted the immigration judge's decision, so it's that decision that's before this court for review. And the facts are not in dispute because the immigration judge found the applicant to be credible and her testimony to be believable, and the BIA did as well by adopting her decision. And there's further no dispute that the harm she suffered is on account of her religious practices and beliefs. Well, I think, at least let me phrase a question or two for you because for me the case boils down to where you draw the line between discrimination or improper conduct that's short of persecution and when it becomes persecution. And the one aspect of the record that was hardest for me to understand was this. In Noudoulko's testimony before the IJ, she said that during her baptismal ceremony, the militia interrupted the ceremony and, quote, frowned old people all over, close quote. Now, is your client asserting that people died, that they were literally drowned at her baptismal ceremony? Is she asserting that? Because this seems kind of incomprehensible in the context of the other things she said. That's, I argued in my reply brief, that that's the only fair reading of the record as I understand it. And there was no cross-examination on that point. And I think the record makes clear that the government-supplied interpreter was woefully inadequate and that there should have been more exploration of that point. I'm asking you if she's asserting that. She's your client. You're saying that's the only reading of the record. The thing that bothers me about the record on that is that her testimony was that after that, she proceeded with her baptismal ceremony. So in other words, I have this picture in my mind of a whole bunch of people being drowned and killed, and then everybody's saying, oh, well, and going ahead with the ceremony. That just doesn't make sense in terms of human experience or reality. Well, it sounds like a very confusing situation. And the testimony wasn't clear, perhaps, because of the inadequacies of the government interpreter. And that might have been a good point for cross-examination, or it might have been evidence to find the testimony not credible. There was no such finding by the immigration judge or by the Board of Immigration Appeals. But the IJ said she was credible. So therefore, she's credible both in the interpretation, they drowned old people all over. And also in the testimony that when that was done, everybody just proceeded with the baptism and the celebration of it, which, you know, which also wouldn't make sense. So how are we supposed to deal with that? Do we have to remand for a fact hearing on? Well, I think that in the. I don't feel comfortable. If I thought that at her baptismal ceremony, you know, 10 people were killed by people by discriminating militia, I would think she'd have a pretty good case of persecution. But despite the credibility determination, I at least as one judge don't feel comfortable acting on the premise that a bunch of people died at that ceremony. I think the government and we agree that a remand is the appropriate disposition of this case. And that's one of the issues that could be clarified on a rehearing. There there was both ineffective assistance of counsel in this case that caused the immigration judge to give additional time for appeal. There was also, as I said, real questions about the adequacy of the translation, not only on that, but on also the numerous threats. And I would say even aside from the drowning, the cases of this court have repeatedly held that credible threats alone are sufficient to constitute past persecution. The Navas case and numerous other cases cited there have found that credible threats of severe harm on the grounds of the protected grounds under the statute can alone constitute persecution. And so even aside from that interpretation, we agree that only about from the petitioner about her, the source of this hospitality to. Well, her branch of Christianity. Yes, there was your honor source of hostility. Well, the State Department report indicates that during the period pre-1991 and in her testimony, she said that the evangelical Christians were considered to be anti-communist. They refused to join the Communist Party. The country report pre-1991, but she's concerned about when did she leave? She left in 19 in September of 1994, your honor. And the if she suffered past persecution even before 1991, then the burden shifts to the government and the government concedes that past persecution even before 1991 would require a remand to allow them to try to prove the country. Conditions had changed so fundamentally that no reasonable person would fear future persecution. And there was no finding by the immigration judge of the BIA that they had carried that burden. And so they concede themselves that there would have to be a remand under the Supreme Court. Ninety one. All of practically all religions were subjected to pretty rigorous behavior on the part of the government. But that's correct, your honor. And I can after that. Apparently there's been a substantial change. There you can almost take judicial notice. Her testimony was that in 1992 and 1993, things improved. But as the immigration judge at page 37 of the record summarized her testimony, that it is now impossible to provide evangelical work. And that's talking about when she left in 1994 and that the organization was harassed. Government officials had said your business was finished in the spring of 1994. Their evangelical meetings were disrupted by militia. She was told that all the people would be shot. And this is the immigration judge's summary of the evidence that the immigration judge found credible. That one time in the middle of the night there was screaming that she would be tortured. She would suffer and she would be finished. That was the end of 93. In the beginning of 94, in the beginning of 94, a number of her missionary friends were beaten. She was stopped by a hooligan who wanted to kill her or or tried to kill her. And these were all findings of post post 1991. And again, in order for the government to carry its burden, they would have to put that put on that evidence and have a finding. You've got to ask your administrator if you want it for your rebuttal. It's up to you. I'll just continue with this finding. Judge, good one. I'll stop for now. Thank you. We'll give you an extra minute. You only have 45 seconds left. So good morning. I can give you one if you need it. I'm sorry. I said we'll give Mr. Smith an extra minute. So you'll get one, too, if you need it. OK, thank you. Could you respond to my concern? This baptismal ceremony. This was before the change of government, right? Yes, Your Honor. And if, in fact, at her baptismal ceremony, you know, a dozen people were killed by militia, wouldn't that be persecution? Just assuming that that drowned really meant that old people were drowned. Would you agree that if that occurred, we would consider being confronted with that persecution? If that occurred in that way, Your Honor, yes, I think that that single event could constitute an act of persecution. Well, that's what I thought under the precedent. So now, how do we deal with this testimony where the interpreter says she says old people were drowned all over? And then when that was done, you know, we went on with the ceremony. But what is what does that mean? There was no follow up by the petitioners council, you know, for elaboration on, you know, did you see them after they were if that happened and there was no follow up by the government council to clarify that it just means someone was pushing their heads down under the water. You know, in other words, I can't tell from this record. I can't tell either, Your Honor. I think you're right that the record is not complete on this fact and exactly what happened during that ceremony. But perhaps that is because there were no drownings at that ceremony. I also find it highly implausible that a baptismal ceremony would continue following the drowning of multiple people. That just seems that is entirely incomprehensible to me. And my interpretation of the record on this point is that that's not, in fact, what happened, that the militia did come in as they were noted to do during that time frame, 1980, in communist Russia. And they disrupted a church service, a baptismal ceremony in this circumstance. They probably created a fracas for some time and then departed. And the ceremony continued to completion. I don't believe the legal handle of how we deal with that statement. Plus, you know, with the credibility finding, we got a credibility finding. So we have to accept the statement. And the statement is they drowned. They came in during my ceremony and they drowned people all over. So are you saying we just need to, in context, interpret that to mean not a literal drowning? Yes, Your Honor. I did not believe it was a literal drowning. But I also think that you have to look at the record as a whole and not just that single incident to determine whether there was a history of persecution in this case. That occurred in 1980. Following that time, she remained for 14 years in the country. She was able, under the circumstances, even under the communists, to obtain an education, to find employment, even though it perhaps was not employment of her own choosing. After the fall of communism and the dramatic freedom of religion which was allowed in Ukraine following the 1991 passage of the law which permitted it, she was able to practice her religion or continue to practice their religion because she was, in fact, never denied the opportunity to practice her religion. But she also was able, during that time frame post-communism, to travel abroad on two occasions. Before she came to the United States, she went to Germany and Israel, and in neither country did she apply for asylum. She came to the United States in 1994 on a visitor's visa for business, and she never returned at that point. Her family has continued to live and freely practice their religion, including the Pentecostal religion, in Ukraine since she departed. And her fear of returning for future persecution appears to be based on what might happen to her if the communist government were to return to power in Ukraine. And the State Department reports are very clear on this at this point, that Ukraine remains a democratic republic. And particularly in the area, there have been some political and economic instability issues in the country as they transition to a new political situation and a new marketing-based economy. But freedom of religion is one of the issues with which there has been the most stability since the fall of communism. Is there a country report update on Ukraine? Yes, Your Honor. There's one. The record. The newest one in the record is 1995, but I did personally check the 2002 country reports, and it continues to report in the area of religion dramatic stability. It does note, and I will acknowledge that it says that there are some regional differences and regional discrimination against religious practices and persons, which has been noted, but that these are localized. And in fact, if you notice in this record, even before the fall of communism, the petitioner was able to move to a new town in 1989 and to live freely and practice her religion, which was well known in that town, without any interference by the communists. So I think that the free exercise of religion today continues what had, again, apparently begun. We have to take her testimony, which has been said to be credible, as genuine. That is that she has a genuine fear that if she is sent back, that the government will change and become communist again and she'll have a problem. So I take it the government's position is that that's not objectively reasonable. No, Your Honor. It's speculative. That's correct. And it certainly hasn't occurred. If she doesn't, she has a difficulty on that. There might be a change of government argument as to, you know, a reasonable fear of future persecution. I'm still pondering whether there's past persecution. Your Honor, in the case of. And frankly, just that one sentence is still hanging me up. So I'm not quite sure how we deal with that. Does the government agree there should be a remand on anything? No, Your Honor, that we do not. If this court, it is correct that if this court were to find that there had been past persecution or a well-founded fear of future persecution under the Supreme Court's decision in Ventura, it would be incumbent upon this court to remand back to the administrative agency to make a determination on that fact. Without a requirement of a remand, I do not believe that the events described in Petitioner's entire testimony, including things like difficulty finding and maintaining employment of her choice, lower grades in school and or teasing by the children. Those type of factors are not the type of extreme factors that this court has found in the previous cases to be constitute persecution. For instance, I would ask you to contrast the case of Korablina versus INS with this case. That was the case involving a Ukrainian Jew. And there were multiple incidents of severe beatings, severe treatment in that case, which was entirely different from the facts of this case. Also, the Board of Immigration Appeals has a decision called Matter of Ozzy and Izzy, also involving Ukrainian Jews, which also presents sharply distinct facts to this case in particular. What's the significance of the fact that, as I understand it, Nagoko never in this period, when she was in the Ukraine, was physically harmed? First, is that correct? She was never physically harmed? That is, well, that is for the most part correct. There was one incident in which the militia interrupted a church meeting where the government officials and she was pushed. They shoved me or something. Right. There's no allegation of beatings or anything like that. The record contains no support for anything like that compared to her. And I would suggest that under the cases decided by this Court, certainly a violent incident would be closer to a definition of persecution. Again, these cases are so fact-dependent, I think it's so important to maintain a view of the record as a whole. I just don't see it. And on behalf of the government, that I guess the standard is we can only grant the petition on past persecution if we think the record compels the conclusion that there was past persecution, not just that you could have found it or you could have not found it. So what's your best argument that the record doesn't compel a conclusion of past persecution, accepting that she's credible and that she said at this baptism in 1980, people were drowned, old people were drowned all over? What are the points you would tick off that the government says show that notwithstanding that statement, it's not compelled? I think it's important to maintain a view of the record as a whole, to look at not an isolated incident, but all of the incidents that occurred to her. I think there is a different interpretation of the word drowned than as it's used. Certainly Petitioner's counsel argues that it meant the intentional drowning and murder of individuals. I do not read it as a whole in the sum of the testimony on that case. But I think it's really important also to look at exactly every incident that occurred to her. And in my view, the evidence in this case does not compel the conclusion that the events which occurred to her were anything more than mere discrimination or harassment. OK, thank you. Your time is up. We appreciate the government's argument. Mr. Smith, we do have a minute and 40 seconds. OK, I'll try to be brief. First of all, at in the government's brief on page 46, they themselves agree that if there was past persecution at any time, either by the former communist government prior to 1991 or by the local workers who threatened to close the mission, and arrest the workers and committed physical assaults in 1991, or the local hooligans or communist sympathizers who harassed the mission workers in 1994, beat some of them, threatened Valentina Magoco, or any combination thereof, then this court must remand this case to the board to determine whether the presumption of a well-founded fear has been overcome. And so I think we agree on that. And so the question is, if there was past right, if there was past persecution, but at any time. And so all the arguments about whether things got better later are not relevant to that question. And the record shows that things did get better for a brief period during 1992 and 93. But the summary from the immigration judge's findings that I read to the court at the end of my time up here previously, itself would constitute persecution aside from anything that happened prior to 1991. And as I said, in the Navis case, 217 F 3rd 646, the court held that threats alone can constitute persecution and cited about six other cases from this circuit. And if there is an unclarity about the drowning, I would say even without that, there has been past persecution based on the assault, the interference with the practice of religion and the threats and the persistent finding of a pattern and practice of persecution. And so we would argue that if there is unclarity about that, that can be solved in the remand. OK, well, thank you very much for your argument. Well, presented by Mr. Smith and his dog. Appreciate it. And the case will be submitted.
judges: Lay , Goodwin, Gould